Please rise. This court is now in session. Please be seated. Would the clerk call the next case, please? 314-0363, People of the State of Illinois, Appellee by Justin Nicolosi v. Rodney Julun, Appellant by Editha Rosario-Moore. Ms. Rosario-Moore, good afternoon. Good afternoon, Your Honors. My name is Editha Rosario-Moore, representing the defendant appellant, Rodney Julun, on behalf of the Office of the State Appellant Defender. The defendant was convicted of first-degree murder of Dwight Jones after a jury trial and sentenced to 50 years' imprisonment. At trial, a redacted video recording of his confession was shown to the jury. The defendant filed a pre-trial motion to suppress that confession because the officers continued to interrogate him after he invoked his right to counsel. He subsequently included the error in a motion for new trial. Now on appeal, the defendant argues that the trial court erred in allowing the jury to see that confession because the police continued to interrogate him after he invoked his right to counsel in order to get him to confess. And this error was not harmless beyond a reasonable doubt because the recorded confession contributed to the defendant's conviction. Now, as to the error, the State concedes that the defendant invoked his right to counsel during the interrogation. But immediately after he did so, the police continued to interrogate the defendant by making statements to elicit an incriminating response. Now the State disagrees on that point. The State says that there was no interrogation because there were no questions asked. But that's simply incorrect. Rhode Island v. Innis tells us that a reviewing court doesn't ask alone whether questions were asked, but looks to the comments and focuses on the accused's perception of those comments to determine whether they're reasonably likely to elicit an incriminating response. And that's what we have here. The video shows that the defendant was brought in and Mirandized. He denied knowing Jones, selling Jones' phone, or being in his car. And then about after an hour, Detective Aduna explains that Jones had been killed and that they thought the defendant had something to do with that. Defendant says, quote, no, now you ought to weaken. Detective says, no. Defendant, can I talk to a lawyer? I need to talk to a lawyer. With that unambiguous request, the interrogation should have ended, but it didn't. Now as the defendant is completing that request, we hear a walkie-talkie beep somewhere along the lines of the next cell phone beep. And an officer in another room makes a statement. He says, quote, even though the name ain't on there, the boost records will show all the records of all the people he's been talking to, and we will go and talk to every one of them, you know? End quote. Now this is relevant because the defendant said that he had a boost mobile phone and the police had just shown him phone records. More importantly, the defendant responds to it as interrogation. He says, you're all going to have to get that then because this is crazy. I don't even know why I'm here. Then you have the detective saying that they have a search warrant for his DNA. It's going to prove that he was in Jones' house and car. The defendant asks again for a lawyer and says, this is crazy. And the detective says, no, what's crazy is when you're sitting in front of a judge for first-degree murder. And so that's clear interrogation. Even if the walkie-talkie comment wasn't meant as interrogation, the officers in the room allowed them to be construed as such by keeping the volume up. And in the video, you see the officers stopping to listen to that comment as well. And, of course, the defendant responded to it as interrogation. And telling the defendant that you have evidence that's going to prove that he's guilty is a tactic. It's positing his guilt as fact. It's not simply informing the defendant of the next steps as the state has argued. And even after the defendant again asked for a lawyer, he's threatened that he'll be in front of a judge for first-degree murder. So these comments are clearly interrogation. It continues an hour later when the detective returns with another officer to execute that search warrant. And as the officer is taking a buckle swab of the defendant, the, um, Beduna asks, hey, did you process that Jetta? And the detective, the officer says, yeah, I did that last week. And Beduna leaves and comes back and announces that he's going to the defendant's house to search. And so those are the same kinds of comments that Beduna made earlier when he said, this evidence is going to show that you were in Jones' house and car. It's meant to elicit an incriminating response. Now, the defendant gave such a response, gave a statement the following morning. In Oregon v. Bradshaw it tells us that if a defendant evinces a willingness to discuss the investigation, a reviewing court has to determine whether his previously invoked right was waived knowingly and intelligently. And here any reinitiation was the product of coercive pressures that eroded his will. Now, the state argues not only that the interrogation ended when the defendant asked for counsel, but that he evinced this willingness to speak generally and gave a voluntary statement. But that's wrong because the totality of the circumstances show that the defendant was coerced into making these statements because of the conditions of his custody. Now, the defendant spent 14 hours after he invoked his right to counsel in the same room. And during that time he asked when he can go home about four times. But unlike his request for counsel, that's ignored. He doesn't get to call a lawyer. He's kept waiting. He's not processed. What is he waiting for? The state doesn't explain why he's there for so long. And the next morning the defendant asks again how long it will take because he needs to babysit his nephew. The officer says, we'll talk to the officers handling the case. But nothing comes of that. It's worth noting that even after the defendant confessed, he asked again for a lawyer, and one of the officers said, well, I can't get you one, but I'll see. I'll ask around and see what I can do. And these circumstances show that the defendant had no reason to expect that his request for counsel would be honored. And the conditions of that room, yes? Does that invalidate the Miranda warning? Well, the Miranda warning, as we note in our brief, you know, at the very beginning of this interrogation, the defendant is Mirandized, and Detective Aduna says, you know, this is just standard procedure. It's like in the TV shows. He rattles off the right's defendant nods, and he gets interrogated. When he's re-Mirandized the next morning, there's no response. There's not a nod. There's nothing audible. It's under these circumstances, being told this is just standard procedure like on the TV shows, having his request for counsel ignored, and then again having them rattled off really quickly with no, hey, are you sure we need a response from you? It's seen as a formality. Now, certainly the defendant continued to speak. But our argument is that his waiver was not knowing and intelligent because it was badgered. My specific question was whether when the police officer told him we don't have one available, we'll look around or we'll check around whether that negated the Miranda. Well, that was actually after the confession when he was told that. He actually wasn't told that initially. He said, can I talk to a lawyer? They said, sure. There was no other discussion about that. And there was no written waiver? No, there was no written waiver. Now, the defendant spent that 14 hours in a windowless, frigid room with gray walls, bright fluorescent lights, a small table, four chairs, and a locked door. He spent the night there. And the State disagrees with our description of the circumstances. The State said it wasn't cold, but the evidence shows that the defendant was cold. He put his arms under his shirt. He asked for blankets. He wrapped himself with them. The State also points out that he was able to order what he wanted from McDonald's. But it's a far cry from what the State argues is getting offered food and drinks repeatedly and getting to eat and drink when he wanted. He's in a locked room. He knocks. He waits a considerably long time. And he slept on the floor under these bright lights. He's seen moving from the table to the floor, moving around. He's woken up in the middle of the night. The next morning, he goes to the bathroom. He comes back. He's moving again from the table to the floor. He's clearly agitated and restless. And eventually, he starts to audibly cry. And then he asks the detectives whether he can speak to them. Now, these were coercive pressures that were far from what the State described as a good night's sleep. The defendant cites to People v. Trotter for the proposition that the defendant's waiver is not knowing and intelligent if the waiver is badgered. And the State didn't address that citation. But in that case, the defendant was in custody for a shorter time. He was there for a murder investigation, Mirandized. He admitted to buying a stereo related to the investigation and then released. The next day, he's arrested again. He's told that there's incriminating evidence against him, and he asks for an attorney. He's able to contact that attorney, and he has to wait a few hours. He's kept in that room. And during that time, he's visited by the officers a couple times. At one point, two officers re-Mirandize him, ask him if he wants to make a statement. He says no. But he talks to one of the officers on unrelated matters, and they chat for about an hour and a half. And right about the time when the attorney is due, the defendant says, you know what, I want to make a statement. And he confesses. Now, the reviewing court in that case found that the defendant did not evince a willingness to speak, even though he wanted to talk to the detective on unrelated matters. And that even if there wasn't an Edwards violation, the waiver of his invoked right was not knowing and intelligent because the officer's conduct for that hour and a half constituted coercive pressures. The court didn't consider each conversation in isolation, but looked at the totality of the circumstances and concluded that being kept in that room, plus the repeated visits, eroded the defendant's will. Now, here, compared to Trotter, you have greater, more apparent coercion that took place over a longer period of time. Coercive pressures are not limited to mental and physical abuse. The state notes that there's an absence of that. But here, it's very clear that the defendant is kept in this room because they're waiting for him to talk. And that his waiver of his previously invoked right was not knowing and intelligent. Now, this error was not harmless beyond a reasonable doubt. It's the state's burden to show that the constitutional error didn't contribute to the defendant's conviction beyond a reasonable doubt. The state argues that the evidence, the remaining evidence outside of the confession is overwhelming because the evidence is sufficient to support a guilty verdict. But an erroneously admitted confession can contribute to a conviction, even where the other evidence would have been sufficient. Now, here, the state can't prove beyond a reasonable doubt that that confession didn't contribute. It's the most powerful piece of evidence. In fact, the state argued during closing arguments that the defendant could be convicted on that confession alone. So, reviewing courts have to be very careful in finding confessions harmless because of their extreme probative weight. Now, in that confession, the defendant first denied involvement. But then he said that he met Jones on the street. They went to Jones' house where Jones tried to sexually assault him. They fought. He hit Jones in the head with a lamp. And then he left in Jones' car and returned the next day with a man named John White. They checked on Jones. They wrapped him in a blanket and poured gasoline on him, took some of his belongings, and then sold them. He said he didn't intend to murder Jones, but he had planned a theft. Didn't know they were going to Jones' house. Now, a redacted version of that was played for the jury. They saw the first hour. They saw the defendant ordering food from McDonald's. And then they saw his confession the next morning. The jury didn't see any of those coercive circumstances that I discussed. And at trial, the state highlighted this confession and based much of its theory of the case on it. They said it also showed that the defendant was deceitful because he had initially denied being involved, but then subsequently admitted that he had been involved. And the defendant also testified at trial. He testified that Jones had actually sexually assaulted him and that he acted in self-defense. He refuted much of his confession and said he was too embarrassed to tell the police when he had been interrogated. Now, the state's analysis that the evidence is overwhelming relies heavily on this testimony. But Harrison v. United States tells us that the rebuttable presumption is that a defendant would not have testified but for the admission of that confession. And that if the defendant is testifying to overcome the impact of that confession, that's not rebutted. And it's clear that the defendant did so here. The state then argues, though, nonetheless, that with this testimony, the evidence is overwhelming because there's no debate that the defendant was in Jones' house on the day of the incident and struck him with a lamp. But that conclusion relies on the testimony. And the confession ultimately... But not necessarily. There's DNA evidence. There is DNA evidence that shows that he was in his house but not when. There's evidence to show that a residential burglary after the fact occurred. But there are holes in the state's case. There's circumstantial evidence, but there are holes in the case. If you ignore the defendant's testimony and ignore the defendant's statement to the officers, the morning statement to the officers, there's still strong physical evidence that's corroborated by independent witnesses. Correct? Yes, there is evidence.  But whether or not the confession contributed to the conviction beyond a reasonable doubt. And so here, we do say that... We argue that it's sufficient to convict on residential burglary. But the holes in the state case are tied together by the defendant's confession and also by his testimony. And so the other evidence is there's jailhouse informant testimony. But that testimony doesn't carry the absolute indicia of truth. Kenneth Bradley testified that he tried to get a deal in exchange for his testimony. And his story that the defendant told him doesn't really comport with the evidence. He says that the defendant told him he killed Jones with his bare hands and the evidence shows blunt force trauma. He says that the defendant said he cleaned the car. The car is not clean. Luckett's credibility was also impeached because he had been convicted of robbery, murder, and kidnapping. And he received a deal from the state in exchange for his testimony as well. Two minutes, please. Thank you. And so, as we said, the confession ties the evidence together that the lamp was even used and that Jones drove the defendant to the house on the night of the incident comes from that confession. It's the most powerful piece of evidence. And so this court cannot say beyond a reasonable doubt that the confession didn't contribute to the conviction. I don't want to split hairs with you, but the lamp wasn't even in the bedroom. It was elsewhere. Right. And the defendant's fingerprint was on the lamp. It was on the lampshade. That's right. But from the confession is where you get the information that the lamp was used. The coroner didn't testify that the lamp was absolutely used. She said it was possible that it was used. Again, not to split hairs, but just to say it's sufficient to convict. But, again, this court cannot say beyond a reasonable doubt that the confession didn't contribute to the defendant's conviction. And so the defendant respects the request of this honorable court, reverses conviction for first-degree murder, and remand for further proceedings. Thank you. You used a phrase throughout your argument that the request for counsel was ignored. Is that in support of your theory that the interrogation continued? Yes. I'm not sure I understand. Well, you said repeatedly that the request for counsel was ignored. Right. How was it ignored? Well, they said, yes, you'll get an attorney. But then the first request for counsel when he's kind of laughing and says, I need a lawyer. Well, he says, can I talk to a lawyer? I need a lawyer. And they ended the conversation and they left the room. They kept talking to him, respectfully disagreeing, Your Honor. They said, we have evidence to show that you were in the victim's house and car. They also said, you're going to be going, what's crazy is when you go before a judge for first-degree murder. And the walkie-talkie comment. And then they left for 14 hours. No, they returned an hour later to execute that DNA search warrant. The same officers that did the interrogation? Yes, plus another officer who physically took the buckle swab from the defendant. And they continued to talk about the evidence in front of the defendant. They say, hey, did you process that JEDA? And the officer says, yeah, I did that last week. It was busy, but I got it done. And then there's also a moment in the video where she's looking for evidence tape. And the detective says, oh, that's the same kind of tape we're going to use for the evidence in your house. And so there's a continued discussion of, we're going to show that you're guilty. So you think those comments consist of continued interrogation? Yes, because they're designed to elicit an incriminating response from the defendant. But they left the room then after the DNA swab was collected at 6.14 p.m. Yes. And they did not see the defendant again until 8.16. Right. So is your theory that the interrogation continued during that time frame? The theory is that the defendant's will was being eroded by the custody. It's a different theory, though. Okay. So the request for counsel, maybe you say it was ignored. There are others that might say it was honored, although there were some little things in there. Basically, they walked away once he said, I want a lawyer. And they kept him. And they left him alone. But that starts a different process. They walked away for 14 hours. It became a standoff. If you won't talk to us, then we're not talking to you. And that's where it became coercive in your theory. Right. There were other officers who were in the room. The defendant said, when am I going home? That was ignored. So our argument is that those circumstances show that his requests were being ignored when it comes to wanting counsel and knowing when am I going to go home. When somebody invokes their right to counsel, what is the officer's duty at that point? To stop interrogating. Right. And our argument is that. You don't have to go out and find a lawyer. No. But I think, according, we analogize to Trotter because in that case, it shows that keeping the defendant in that room instead of transferring him was designed to get him, his will, to be eroded. Yeah, I see two issues here. Okay. So, one, did the interrogation stop? And, two, did something happen that became so coercive that when the Miranda warnings were given in the morning, they weren't well received because he had been broken at that point? But I see during the arguments you're modeling the theories just a little bit. Yeah, and I think it's because it's not such a clean-cut fact pattern here. We have. Well, if the interrogation continued until the officers were done with the DNA swab, what statements were given at that point in time? By the defendant? Mm-hmm. Well, there's case law that says the defendant's subsequent comments after asking for an attorney can't be used to cast doubt. He never said, I don't need an attorney. And he didn't say, I want to continue to talk until his will had been eroded. We have a unique set of circumstances here. I understand. Yeah, we do. And I understand what you're saying, too, that it's difficult to put into one category. But I think what you have here is a combination. You have the interrogation not in. I understand. Okay, thank you. How long were they in there taking a swab? It was about an hour. It took a little bit longer. They took a swab. Well, they took a swab. They took hair. They took fingerprints. So there were a couple different steps to that. You think it took an hour? It might have been a little bit less. It was a little bit after 6 and then it was close to 7, I believe, when they ended. You can't quote me on the exact time. But, I mean, I could actually check my timeline. We'll conference on that. Okay. Okay. We can all look at the same video. Right. Okay. Are there any other questions? No. Okay. Thank you. Thank you. Mr. Nicolosi, good afternoon. Good afternoon, Your Honor. May it please the court, counsel. I apologize. I apologize. Rousing start. Do you need some water? I'm okay. Thank you. I've been fighting this for a week or so. Okay, so I think Justice Wright, you broke it down. I was having a little bit of trouble preparing, kind of. It was hard for me to keep the issues separate as well. There's just some great boundaries here that I wanted counsel to clarify. Sure. And the first issue, I think, is whether or not this defendant was interrogated after requesting counsel the first night that he was here. And if the answer is yes, then what is the remedy? And the remedy is the exclusion of the statements. But there weren't any for 14 hours. And that's a big part of my argument in the brief and right now, that the fact is there was no ñ I think it's crystal clear that the defendant didn't provide any statements the first night he was in there. Let's just assume, for the sake of argument, that he was interrogated after he requested a lawyer. Of course, he was not. Maybe I should stop there. Let's just first say he was not interrogated that night after he requested a lawyer. The walkie-talkie voice, as counsel mentioned, there were a couple other comments that the defendant points to as those were designed to yield some sort of incriminating statement. The people strongly disagree with that. The walkie-talkie voice mentioned the phone log between, from the phone that was the victim's that was eventually sold. They printed off the log. The voice said something about, well, we'll check into the log. Well, Detective Beduma, earlier in the interrogation, he mentioned the log. He brought it. He talked about these calls. He said that there were ten calls between the defendant and Jones. So that wasn't new information. If it didn't elicit any kind of response the first time, how the heck was it the second time? And if you go to all the other comments that the defendant talked about, none of these were likely at all to elicit any kind of reaction. The first night, the entire first night that the defendant was in there, he never mentioned that he knew Jones, that he was there. He denied all involvement. He held very firm on that point the entirety of the first night. So any of these comments, which, of course, were not questions, as the defendant said, yeah, they weren't questions, but they were comments designed to elicit an answer. I think it's important to know that they were not questions. They were not the normal course of the questioning that took up the first hour that first night. Do you agree that comments designed to elicit questions are significant? They can be, Your Honor. But I think what's important here is we need to look at the totality of all the circumstances here. That's what case law is quite clear. Does that include the duration? It certainly does. Yeah, there's five factors that have been discussed. Can you go back to my question, though? Let's say I'm going to put some words in your mouth, assuming arguendo that those responses by the officers were in the nature of an interrogation designed to elicit an incriminating response. Was there an incriminating response given? No, there wasn't. So don't we end the analysis there? We certainly should. As Justice McDade mentioned during the defendant's argument, that Miranda was provided the next morning when the defendant reinitiated. So that becomes the second issue? Yes. Could he knowingly process that information? He certainly could. I think it was clear by watching this video that the defendant knowingly waived his previously invoked right. And while it wasn't audible when Detective Iduna read Miranda, asked if he understood, it wasn't audible, but the detective testified very clearly that the defendant understood his Miranda rights again, that he had rights to counsel, of course, and proceeded to want to talk more about this incident. Of course, he initiated this conversation. There's no debate that he knocked on the door and said, hey, I didn't have anything to do with this. He wanted to talk about it. So I think it was crystal clear at the beginning of the morning. He knew what his rights were. He waived those rights, and he wanted to talk. So can we talk about the elephant in the room, and that is why was he still in the interrogation room after 14 hours? Your Honor, I don't know the answer to that one. That issue wasn't necessarily flushed out. I will say that it's clear, the law is very clear that probable cause has to be established within 48 hours of its detention, and this was, well, within the 48 hours. The defendant was aware of that because he spoke about that on the tape. He didn't know that. He didn't know that. And so why was he there overnight? I don't know the answer to that, but what I can say is, and we all watched the video, he was provided all the essentials. The trial judge even commented he was provided food, water, bathroom breaks. He was provided cigarettes. When he wanted a blanket, he was given a blanket. Had the trial judge seen the unredacted tape? I don't know about that. So he didn't have the full situation in front of him? Well, you're... When was the tape redacted? When? Why? I don't know. I don't remember. They took out all the parts that showed arguable coercion. Well, for the... I wouldn't even argue that that's been coercion. I think... Arguable coercion. They took out all of that. They took out all of that. Your Honor, I don't remember why or if that was discussed, but I think what is there, it's pretty clear that the defendant was treated pretty well by these officers. He wasn't overly questioned. He wasn't harassed. He wasn't hit. He was given Miranda. He knew what his rights were. There are cases where the duration of the detention was much longer than this one. This was a little over 24 hours. The Supreme Court has held that 37 hours was okay in a case called People v. House, and 34 hours was okay in People v. Nichols. So if we just want to go on straight numbers here, this is considerably less than cases that have already been decided in favor of admitting these videos. In those cases where the offenders and suspects isolated, this is really kind of like solitary confinement. He's just in that room. But, Your Honor, one of the... I don't remember the specific facts of those cases. Thank you. But I don't believe there are any specific rules that somebody can't be isolated for a certain number of time. The detectives, after interrogating him for the first hour and they left, they told him some of those comments the defendant was referring to about the search warrant will prove that you were housed. I believe that's where they were going. And that was the nature of that comment was to inform the defendant, hey, this is where our investigation is going now. They informed him what they were doing. This is what's happening next. The DNA technician was in later, took the hair and the prints and whatnot. So I think those comments were designed to inform him what was going on. So I think they were busy investigating this crime. But, again, yeah, I can't account for every single minute that he was left in this room by himself. But, again, I just don't believe watching that tape and the trial judge watched the tape, and I just don't believe he was coerced into an unknowing and unintelligent waiver of his right to counsel. I think it was clear he knew what his rights were. Is any waiver of counsel ever intelligent? I think that's a different question. I would argue probably not. But, again, the rule. But it's certainly knowing. He certainly knew what his rights were. He asked for counsel before, but at this point he didn't want it. He knew he had it, and he didn't want it. I think, again, I think that the video was pretty clear that he knew what he was doing. Why didn't he want it? Well, because he understood his rights. He was Red Miranda the morning he spoke with. Why did you ask for a waiver if you didn't want one? That's an excellent question, Your Honor. I don't know. Why did you think that he didn't want one? Because he didn't ask for one in the morning. But he did ask for one. Yeah, and there was... You're saying he didn't want one. Come morning, no, he didn't. Did he want one when he asked for it? Yes. Oh, sure. And that's why questioning ceased. They didn't ask a single question the rest of the night. They didn't ask a single question until the following morning when he knocked and said that he wanted, you know, insinuated that he wanted to talk about it. There wasn't a single question posed to him the rest of the night. The cases that you talked about and other situations with long, solitary confines, did people have a place to sleep? I don't know the details of those cases. It didn't look like the defendant had any problem sleeping. He asked for a blanket, and I've slept on the floor, Your Honor. He asked for a blanket, and he was given a blanket. He didn't ask for a cot. If he asked for a cot, maybe they would have brought him a cot. I don't know. But, again, the cases don't, you know, the law doesn't say that he has to be given a hotel room or that he has to have another person in the room. The law is not specific on any of this. All it says is that he, you know, was his will overborn in the treatment of him to confess. And I don't see how watching this video it can be argued that his will was overborn. I truly don't. He knew what was going on here. He read his rights, and he decided to talk. The trial judge, again, the trial judge made a lot of factual findings, and his findings are entitled to very strong deference. He even found that the defendant wasn't, quote, browbeat. He was treated, quote, just fine, and there was nothing intimidating. That's another direct quote from the trial judge. He saw all this. He saw the way that the detectives didn't threaten him, they didn't harass him, they didn't swear at him. I don't know what more the detectives could have done. They could have gotten to it a little earlier and not waited the whole night. But, again, show me a case that says that a defendant can't be in a room for many hours overnight, especially while a possible investigation was happening outside. So for all those reasons, as I wrote in my brief, I submit that there's an intelligent and voluntary waiver of his previously invoked right to counsel in this case. I wonder if a trial judge would feel the same way if he were the one that sent the complaint. These are hypothetical questions. I don't know the answer. I don't think it matters. I don't know if it matters the way I would feel. Unfortunately, we just have to go by what the case law says and analyze it and look at the facts and I guess basically trust the defendant's word that he wanted to talk and that he knew what his rights were and that he wanted to proceed and talk to the detectives. I don't know what else we can do. But if this court feels that the video should have been suppressed, the people submit that any error was harmless in this case. I want to focus on the defendant's testimony. His defendant argued that he was basically coerced into testifying because this video was omitted. The people strongly disagree with that. As Justice Wright stated earlier, the physical evidence that existed apart from this video were very strong that the defendant pretty much caused this death. Again, there are a lot of witnesses that the defendant was driving the victim's car in the days after. Dante Brown testified that the defendant sold him the victim's cell phone, which obviously means that it puts the defendant right at the scene of the crime. But the most damning evidence is that the defendant's fingerprints were on this lamp that was bloody, that was broken. And his DNA was on a beer can in the house and his profile couldn't be excluded from all kinds of other things that were in and around the house. There was no other... It's extremely strong, Your Honor. And you can even add to that the testimony of Darnell Luckett, who testified that the defendant tried to get Luckett to say that Reed and White set him up. Kenneth Bradley testified that the defendant told him what happened. There were the autopsy revealed wounds on the back and neck. I think it's pretty clear that the lamp was involved and the defendant's fingerprints were on the lamp. So I think there's quite a bit of physical evidence that points to the defendant having committed this crime. So the people would argue that because the evidence that he was involved was so strong, he would have had to testify in order to present his theory of self-defense. Otherwise, it wasn't getting in front of the jury. So with that, the people would again submit that or request this court to affirm the defendant's convictions and affirm the trial judge's granting of or denial of the defendant's motion to suppress. If there are any other questions, I'd be happy to answer them. Thank you. Ms. O'Hara. Just to respond to the State's comment to show him a case. I mean, we did trotter, and there's no response from the State on that case. We have a much shorter period. We have a little under four hours. And the circumstances are similar to the facts here. You have a request for counsel. You have an interrogation that ends up continuing in a different way. You have officers visiting him, and then the defendant says, I want to talk to you, but not about the case. And the review in court in that case found that he didn't evince a willingness to speak because of the coercive pressures that he was under. He wasn't taken out of the room to wait for his attorney. He was kept in that room. And it's a lot subtler than physical and mental abuse. And so you can have circumstances here that are much less than what we have and still have coercion. Let me kind of wrap my brain around this. If nobody's argued here that he was, like, illegally seized, right, that they didn't have the – I think there's a huge difference between keeping him in this room and taking him to the county jail. There's lots of different factors. The first thing is when you're booked in a county jail, it's a matter of public record, and people can find you. And I think here the video shows the defendant saying, when am I going to go home? I'm supposed to be babysitting my nephew. We have no idea if anyone knows where he is. That's clearly a concern of his. The other thing is his every move's not being recorded. You have evidence here on the video where he actually looks at the camera and says, can I go home? He knows he's being recorded. That's an added coercive pressure. You also have a standard as to making phone calls. And you have different people. I think those circumstances would be very different, and I think they would be a lot less coercive than here. What about the trial judge's comment that, you know, they picked him up on a warrant. He wasn't going anywhere anyway. And so the trial judge, when he said he – well, he wasn't browbeaten, and he wasn't going anywhere anyway. Do you think the fact that they had him on a warrant? I think the defendant had no idea. I think he would have known that he was not going home. And that's a different thing for him. It's not eroding his will so that he can find out what happens and he can be released or he can move on to the next steps. He's being held there kind of in a purgatory. They're waiting for him to talk. He doesn't know what's going to happen to him. He clearly wants to know, but he's not being told. And I think, you know, that comment ignores the impact that it's having on the defendant. And I think – Of course he doesn't have a choice. No, but of course he doesn't have a choice. He has no idea what's happening to him. And he's also, as I said, being video recorded. I think also to the findings that the State referred to, and we referred to on our brief as well, this case has a slightly unusual procedural history because you have first a motion that was filed by counsel saying that we want to suppress the statements because they were given under coercion. There's no argument that he invoked his right to counsel and it wasn't honored. The court denies that. That counsel withdraws because of a conflict. And then new counsel files a motion to reconsider that motion and then files another motion because of the invocation of the right to counsel. And to your question earlier, Justice McDade, the trial court saw it twice, the entire video twice. And the second time made no findings of fact. So there are no findings of fact as to the invocation of the right to counsel. But further – The findings of fact went to the first motion. To the first motion, right. And they did address the circumstances. But even those findings of fact are erroneous because the judge finds, well, everything the defendant asked for he got. Well, that's not true. He wanted to know when he was going to go home. He wanted to contact family. And, again, the comment is you said he's not going anywhere anyway. Those comments ignore or do not address the other circumstances that the defendant was subject to and certainly don't address the invocation of the right to counsel. The second time. The first time he invoked counsel, he did so knowingly, and that wasn't over. It's whether he gave that up the second time. Right, but the court's findings went to the totality. Like, the court was addressing the fact that he got a good night's sleep under the circumstances. So the court was expanding the frame in that way. You said that the judge saw the full tape twice. Yes. But the jury did not. No, the jury saw the tape. The defense counsel agreed to the redacted video. I imagine had to do with the invocation of the right to counsel. That would be my guess, but that's not stated on the record because it ends right before he asked for an attorney. And then you see him ordering food from McDonald's, and then you see the confession the next morning. And just to the State's point about the defendant testifying, saying the defendant would have testified in order to raise self-defense, looking at that evidence, again, that's not the only theory of the case that the defense could have presented. And so because the defendant actually testifies, hey, what I said in my confession isn't the story, this is the story, it's very, very clear that he's testifying in order to overcome the impact of that confession. One minute. Are there other questions? If there are no other questions, then I would say that the defendant respectfully asks this Honorable Court to reverse his conviction for first-degree murder and to remand for further proceedings. Thank you very much. Thank you. We thank both of you for your arguments this afternoon. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The Court will stand in brief recess with panel change. Please rise. The Court stands in recess.